UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X
MARIA BONET,                        :
                                    :
                Plaintiff,          :
                                    : 05 Civ. 2970 (LTS)(THK)
                                    :
        -against-                   : **REPORT AND**
                                    : **RECOMMENDATION**
JO ANNE B. BARNHART                 :
COMMISSIONER OF SOCIAL SECURITY,    :
                                    :
                Defendant.          :
----------------------------------X
**FROM:  THEODORE H. KATZ, UNITED STATES MAGISTRATE JUDGE.**
**TO:    HON. LAURA TAYLOR SWAIN, UNITED STATES DISTRICT JUDGE.**

_____Plaintiff Maria Bonet brings this action, pursuant to 42
U.S.C. § 405, to obtain judicial review of a final decision of the
Commissioner of Social Security (the "Commissioner"), concluding
that she was not disabled and therefore not entitled to
Supplemental Security Income ("SSI") benefits.  Plaintiff has moved
for judgment on the pleadings, pursuant to Rule 12(c) of the
Federal Rules of Civil Procedure, seeking reversal of the decision
of the Commissioner.  The Commissioner has cross-moved for a
judgment on the pleadings, also pursuant to Rule 12(c), seeking
affirmance of the Commissioner's decision to deny benefits to
Plaintiff.

        The action was referred to this Court for a Report and
Recommendation in accordance with 28 U.S.C. § 636(b)(1)(B) and (C).
For the reasons that follow, I recommend (1) that the
Commissioner's decision be reversed and the case remanded for the

1

calculation of benefits for the period of April 2002 to March 2003, and (2) that the case be remanded for further development of the record for the period of April 2003 to December 2003.

**BACKGROUND**

I.    Procedural Background

        Plaintiff filed her initial application for SSI benefits on April 23, 2002. (See R. 110-13.)[1] She claimed that she was disabled due to Post-Traumatic Stress Disorder ("PTSD") and depression. (See R. 116, 125.)  Plaintiff also takes medication to treat bronchial asthma (see R. 121, 208), a condition which could limit her ability to work if she is not found emotionally disabled (see R. 208-12).

        On June 14, 2002, Plaintiff's application was denied. (See R. 71-74.)  Plaintiff then requested a hearing, which was held before Administrative Law Judge ("ALJ") Paul A. Heyman, on December 10, 2003. (See R. 34-69.)   The ALJ issued a decision denying Plaintiff's claim on February 27, 2004. (See R. 15-29.)  On March 15, 2004, Plaintiff requested a review of the ALJ's decision by the Appeals Council of the Social Security Administration's ("SSA") Office of Hearings and Appeals. (See R. 12-14.)  The Appeals Council denied Plaintiff's request on February 24, 2005, making the ALJ's decision the final decision of the Commissioner. (See R. 4-

_____

        [1] Citations to the administrative record are in the form "(R. _.)"

6.)

II.  The Administrative Record

     A.  Non-medical Evidence

_____Plaintiff was born in Puerto Rico on February 7, 1964. (See R. 38, 110, 158.)  As a child, she was sexually molested. (See R. 46, 158.)  She was also beaten by her mother throughout her childhood, sometimes with a wooden pole, and physically and verbally abused by her alcoholic father. (See R. 158.)  These beatings continued through her adolescence, a time during which she had no friends and performed poorly in school. (See id.)  After dropping out of school in the eleventh grade, Plaintiff passed a GED test in Puerto Rico in 1986. (See R. 61, 131, 269.)  She speaks no English. (See R. 18, 28, 40.)

     Plaintiff married her first husband when she was nineteen years old. (See R. 46.)  This relationship was extremely abusive, as her husband repeatedly raped and beat her, and threatened to kill her. (See R. 46, 159.)  She recalls this abuse in recurrent episodes, which cause insomnia, nightmares, and panic. (See R. 159.)  She has attempted suicide at least once. (See R. 20, 157, 175, 186, 192.)

_____Although Plaintiff was thirty-nine years old at the time of the hearing (see R. 38), Plaintiff's work history is limited to a job she had cleaning offices when she was nineteen; she quit that job after three months because of constant depression and frequent

crying spells (see R. 41-42, 159). According to Plaintiff's Social Security unemployment records, she had an income in 1998, 1999, and 2000, but Plaintiff maintained at her hearing that she had never worked, apart from her earlier office cleaning job, and that she had not received any income from 1998-2000.[2]  (See R. 42-43.)

Plaintiff remarried, but does not live with her second husband because memories of her first husband's abuse triggered her anger and caused her to attack her current husband. (See R. 59.) Plaintiff lives only with her thirteen year old son, with whom she maintains a healthy relationship. (See R. 50).  She is able to clean her apartment and prepare meals. (See R. 50-51.)  She can travel by herself, using buses for short distances, but does not like to take trains because she experiences nervousness while riding them. (See R. 19, 39-40, 55).

B.    Medical Evidence

Plaintiff has been diagnosed by various physicians as having a learning disability, PTSD, depression, and asthma. (See R. 175, 182, 190, 202-03, 208-12.)

1.    Mental Health

Dr. Annmarie Perez, a licensed clinical psychologist at the

---

[2]Plaintiff also testified that she had lost her documentation, including her birth certificate and Social Security unemployment records, pertaining to those years. (See R. 43.)  The ALJ suggested at the hearing that he might seek authorization to obtain tax returns for the years in question, but nothing further is mentioned by the ALJ about this inconsistency in the record. (See id.)

South Bronx Center for Children and Families, began treating Plaintiff on February 20, 2002. (See R. 155.) After a month of appointments with Plaintiff, Dr. Perez found symptoms of PTSD and depression, and referred her to a mental health agency for ongoing psychotherapy and psychiatric evaluations. (See id.) Dr. Perez met with Plaintiff again on May 17, 2002. (See R. 182.) Dr. Perez stated she did "not do any psychological testing" during this visit (see R. 183), but noted that Plaintiff was having problems with depression, irritability, controlling her temper, nightmares, flashbacks, sleeping, and low appetite (see R. 182). Dr. Perez also recorded "some memory problems, likely due to trauma . . . concentration appeared good . . . relationship difficulties with husband. Further info unknown about [Plaintiff's] interaction [with] peers." (R. 186.) Finally, Dr. Perez noted that she could not provide a medical opinion regarding Plaintiff's ability to work, as she is a clinical psychologist and not a medical doctor. (See R. 187-88.)

After her month with Dr. Perez, on March 27, 2002, Plaintiff began receiving treatment at the South Bronx Mental Health Council. (See R. 157-69.) Between April 19, 2002 and December 9, 2003, Plaintiff's treatment consisted of weekly psychotherapy sessions with psychotherapist Yesenia Rivera, and monthly psychopharmacological sessions with Dr. Fernando Mejia, a staff psychiatrist who became Plaintiff's treating physician. (See R.

213, 245-96, 329-74.)  At Plaintiff's initial interview on March 27, 2002, Dr. Mejia recorded a diagnostic impression of PTSD and recurrent major depressive disorder. (See R. 169.)

Over the course of Plaintiff's treatment, Dr. Mejia has prescribed Plaintiff the following medications: Paxil, Vistaril, Neurontin, Risperdal, and Trazodone.[3] (See R. 223-26, 324.)  Early on in Plaintiff's treatment, on March 27, 2002, she began taking 10 mg of Paxil, an antidepressant, and by May 1, 2002, her dosage was increased to 30 mg. (See R. 225.)  For anxiety, on April 9, 2002, Plaintiff began taking 25 mg of Vistaril. (See id.)  On May 1, 2002, she also began taking 0.5 mg of Risperdal, an anti-psychotic medication often prescribed to treat schizophrenia and the affective symptoms that accompany it, namely anxiety, feelings of guilt, and depression. (See id.)

In an undated letter, Dr. Mejia wrote:

[Plaintiff] reports in sessions experiencing flashbacks of her past, intrusive perceptions and thoughts about past traumatic experiences, acting as if she was still in danger, physiological reactivity to cues that resemble her history.  [Plaintiff] tries to avoid conversations, places and people that will remind her of her multiple traumatic experiences.  She reports finding herself socially isolated, irritable, with difficulties concentrating, hypervigilant and with difficulties sleeping including nightmares about the violence she experienced.  [Plaintiff] is currently unable to follow a daily routine due to the unexpected symptoms which she is currently unable to control.  For example, [Plaintiff]

---

[3]Plaintiff was prescribed 50 grams of Trazodone, an antidepressant, on March, 27, 2002, but this prescription was discontinued on April 9, 2002. (See R. 225.)

reports inability to have friends and to be intimate with anyone at this time. It is unclear in how long her symptoms will decreased [sic] or/and in how long she will have ability to manage them. She is in dire need to continue her treatment and to minimized [sic] her stressors at home.

(R. 213)

The extensive progress notes recorded by Rivera, the therapist who met with Plaintiff one to two times per week, essentially support the diagnoses in this and other reports by Dr. Mejia. Plaintiff began her therapy sessions with Rivera on March 27, 2002, on which date Plaintiff became tearful while recalling the history of her own anger outbursts and sexual abuse by others. (See R. 245.)

On April 22, 2002, Plaintiff had a collateral session with her husband, at which he talked about Plaintiff's mood swings, irritability, and isolation. (See id.) Plaintiff had a mild depressed mood and corresponding affect, and reported experiencing memories about her sexual abuse at the hands of her first husband. (See R. 246.) Plaintiff was tearful during the session and Rivera noted that she was in need of treatment for her trauma flashbacks. (See id.) On April 29, Plaintiff reported having nightmares, flashbacks of past abuse, irritability, and marital difficulties. (See R. 247.) Rivera noted that Plaintiff continued to be in need of treatment to learn how to cope with anxiety, anger, and depression. (See id.)

On May 1, 2002, Dr. Mejia noted Plaintiff's complaints of

memory problems and depression. (See R. 248.)  On May 6, Plaintiff recounted to Rivera her flashbacks of physical and sexual abuse by her ex-husband. (See R. 249.)  Rivera noted Plaintiff's report that she could not travel alone, as she gets lost. (See id.)  Rivera recommended that Plaintiff continue therapy to decrease depressive symptoms and neutralize anger. (See id.)  On May 20, Rivera noted that Plaintiff was still experiencing nightmares of past physical and sexual abuse. (See R. 251.)  On May 28, Plaintiff told Dr. Mejia she was feeling much better, and the same treatment was continued. (See id.)

On June 3, 2002, Plaintiff presented with a mildly anxious mood and agitated affect, and reported having an anger outburst. (See R. 254.)  On June 10, Plaintiff was again mildly anxious and in a depressed mood with corresponding affect. (See R. 254.) Plaintiff's symptoms included social isolation, ruminative thoughts, sadness, difficulty concentrating, and forgetfulness. (See id.)  Plaintiff was tearful during this session. (See R. 255.) On June 18, she presented with a mild depressed mood with sad affect. (See R. 255.)  Plaintiff was tearful while reporting that flashbacks of her ex-husband's abuse continued. (See R. 256.)

On July 8, 2002, Rivera reported that Plaintiff was in an anxious mood with a somewhat agitated affect. (See R. 258.) Plaintiff reported that she continues to live apart from her husband. (See R. 258-59.)  On July 11, she was still experiencing

nightmares involving her abusive ex-husband and was feeling irritated with SSI procedures. (See R. 259.) On July 24, Plaintiff reported to Dr. Mejia that her nightmares persisted, that she was thinking too much, and that she feels like she is being followed. (See R. 260.) On July 29, she was tearful, finding it difficult to talk about her abusive past. (See R. 262.) Plaintiff added that memories of past abuse made it very difficult for her to be with her current husband. (See id.)

On August 5, 2002, Plaintiff reported that she still experienced flashbacks, and remained separated from her husband. (See R. 263.) On August 13, Rivera reported that Plaintiff was feeling irritable and anxious, and expressed that she could not work because she was unpredictable. (See id.) On August 27, Plaintiff was extremely anxious about her SSI case, and began crying before she could discuss her past issues. (See R. 265.)

On September 3, 2002, the therapist noted that Plaintiff was very anxious and agitated, repeatedly mentioning that she was unable to work and should quality for SSI benefits. (See R. 266.) The therapist noted that Plaintiff "needs to continue exploring ways to alleviate her symptoms and diminish her depression." (Id.) On September 9, Plaintiff acknowledged that she needed to talk about her difficulties coping with flashbacks, irritability, and sleeplessness. (See R. 266-67.) On September 30, Plaintiff was in a euthymic mood with corresponding affect. (See R. 270.) She

nevertheless reported irritability and anger outbursts, and stated that she isolated herself when angry in order to calm down. (See id.)

On September 10, 2002, Dr. Mejia opined, "[Plaintiff] is currently unable to work due to the multiple depressive and anxious symptoms she is experiencing limiting her capacity to accurately perceive reality, to appropriately solve daily routine difficulties, to follow routine schedule and to appropriately relate to others. At this time and place, it is unclear how long the mentioned limitations will last." (R. 304; see also R. 306.)

Dr. Mejia then prepared a Physician's Report for Claim of Disability Due to Mental Impairment ("Physician's Report"), on September 16, 2002. In the Physician's Report, Dr. Mejia described Plaintiff's symptoms, writing:

> [Plaintiff] reports unwanted intrusive recollections in images, thoughts and perceptions of her past abusive history, insomnia including nightmares, losing sense of reality, avoidance to cues that resemble past traumatic history, feeling detached from others, irritability, anger outbursts, difficulty concentrating, depressed and anxious mood, decrease [sic] energy level, feeling worthless and sad, auditory and visual hallucinations.

(R. 309.)

Dr. Mejia's Physician's Report also noted that Plaintiff was markedly limited in the following areas: 1) the ability to understand and remember detailed instructions; 2) the ability to carry out very short and simple instructions; 3) the ability to carry out detailed instructions; 4) the ability to maintain

10

attention and concentration for extended periods; 5) the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; 6) the ability to interact appropriately with the general public; 7) the ability to accept instructions and respond appropriately to criticism from supervisors; 8) the ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; 9) the ability to respond appropriately to changes in settings; 10) the ability to be aware of normal hazards and take appropriate precautions; 11) the ability to travel in unfamiliar places or use public transportation; 12) the ability to set realistic goals or make plans independently of others. (See R. 312-15.)

Furthermore, Dr. Mejia found in the Physician's Report that Plaintiff was extremely limited in these areas: 1) the ability to sustain an ordinary routine without special supervision; 2) the ability to work in coordination with or proximity to others without being distracted by them; 3) the ability to complete a normal workday and work week without interruptions from psychologically based symptoms and to perform at a consistent pace without unreasonably lengthy rest periods; 4) the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. (See id.)

Notably, Dr. Mejia did not find one area pertaining to mental

residual functional capacity in which Plaintiff did not have some significant limitation.[4] (See id.)

Dr. Mejia recorded under Axis V that Plaintiff's Global Assessment Functioning ("GAF") score on the date of the test was 50. (See R. 308.) "Axis V is for reporting the clinician's judgment of the individual's overall level of functioning . . . . The reporting of overall functioning on Axis V can be done using the [GAF] Scale." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. Text Revision 2000) [hereinafter DSM-IV-TR]. A GAF score within the range of 41-50, denotes that the test-taker is suffering from "[s]erious symptoms (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g. no friends, unable to keep a job)." Id. at 34. Finally, Dr. Mejia noted in the Physician's Report that Plaintiff possessed "average intelligence, fair insight and fair judgment." (R. 309.)

On October 7, 2002, a replacement social worker suggested to Plaintiff that she see her social worker two times a week, as she seemed to require extra emotional support. (See R. 271.) Plaintiff was feeling extremely angry and reported that she feels suicidal at times, but added that she was able to overcome thoughts of suicide

---

[4]Dr. Mejia found Plaintiff to be either moderately, markedly, or extremely limited in all diagnostic areas. (See R. 312-15.)

using coping mechanisms and supportive therapy. (See id.)  On October 10, Plaintiff presented with anxious mood and agitated affect, and was tearful explaining a conversation she had with her mother about the sexual abuse she endured during her childhood, but was also happy to know of her mother's love and concern. (See R. 272.)  On October 17, the therapist noted that Plaintiff appeared depressed and anxious with corresponding affect, and that Plaintiff was tearful at times. (See R. 273.)  Plaintiff reported that she was unable to sleep or eat for two days because of worries about her mother's deteriorating health. (See id.)  On October 28, she was in higher spirits because of improvements in her mother's health, as well as in her marriage. (See R. 275.)

On November 11, 2002, Plaintiff was tearful and again in low spirits because of further problems with her mother's health and her mother's wish to leave her and return to Puerto Rico. (See R. 276.)  On November 18, Plaintiff shared that she was well, and expressed pride in the fact that her son had made the honor roll at his school. (See R. 277.)  Rivera noted that Plaintiff was doing well with her current regiment of treatment. (See id.)  On November 25, Plaintiff was sad because her mother remained hospitalized, and felt regret that she never received the love, attention, and understanding she needed from her mother. (See R. 277-78.)

On December 3, 2002, Plaintiff was in higher spirits after a conversation in which her mother expressed her love for Plaintiff

and apologized for her inability to give Plaintiff more attention. (See R. 278.)  On December 9, Plaintiff complained of feeling overwhelmed with past memories. (See R. 279.)  On December 16, when discussing the placement of her mother in a nursing home, Plaintiff said that her mental health condition made it impossible for her to care for her mother in her own home. (See R. 279-80.)  On December 30, Plaintiff was sad and tearful because she believed one of her sisters was abusing her mother, but also communicated that she felt better because of the therapy session, which allowed her to verbalize her feelings.  (See R. 281-82.)

In his Condition Status Report on December 16, 2002, Dr. Mejia wrote, "[Plaintiff] continues to experience acute psychiatric symptoms which limit her emotionally . . . . [She] cannot perform any type of job at this time." (R. 307.)

On January 6, 2003, Plaintiff reported that she continued to experience PTSD symptoms, and had recently had an explosive anger outburst. (See R. 282.)  On January 13, she was in an anxious mood with agitated affect, and told Rivera that her nightmares continued. (See R. 283.)  On January 27, Plaintiff explained that she felt like she had not progressed because her nightmares and flashbacks had not stopped. (See R. 285.)  She also shared symptoms of paranoia, feeling like she was being followed, and hearing voices calling her. (See id.)  In addition, during this month, Plaintiff's dosages of medication were increased - Paxil from 30 mg

to 40 mg, Vistaril from 25 mg to 50 mg, and Risperdal from 0.5 mg to 1.0 mg. (See R. 226.)

On February 4, 2003, Plaintiff was in a depressed mood with sad affect because her husband had started seeing another woman. (See R. 286.)  On February 11, she was irritated and tearful because of her marital situation. (See R. 287.)

On March 3, 2003, Plaintiff related an anger outburst, triggered by a fight with her husband that resulted in her slapping him. (See R. 289.)  On March 10, Plaintiff was still in low spirits because of the marital dispute, and while acknowledging guilt for her actions, she said that her husband's infidelity had caused flashbacks of her abusive relationship with her first husband. (See R. 290.)  Then, on March 17, 2003, Rivera wrote, "[Plaintiff] shared multiple depressive symptoms such as difficulties sleeping, decrease[d] appetite, frequent crying spells, decrease[d] energy level, [and] excessive guilt." (R. 291.)  On March 28, Plaintiff was tearful and described feeling overwhelmed with anger and hurt directed at her husband, who was calling her up to insult her. (See R. 293.)

In a Condition Status Report dated March 28, 2003, Dr. Mejia cautioned that "[Plaintiff] cannot work at present time due to acute psychiatric symptoms."[5] (R. 222, 305.)  This was Dr. Mejia's

---

[5]In an undated Physician's Employability Report, Dr. Mejia wrote, "Patient cannot perform any type of job due to nervousness, depressed symptoms, sadness, mood swings." (R. 306.)

last assessment in the record of Plaintiff's ability to work.

On April 4, 2003, Plaintiff talked about feeling worthless and was tearful, reporting that she continued to have flashbacks and ruminate about her history of abuse. (See R. 329.)  Even though PTSD symptoms persisted, Plaintiff left the session feeling more calm. (See R. 331.)  On April 8, she was mildly anxious and somewhat agitated, and past memories caused her to become tearful for five minutes. (See R. 331.)  On April 10, Plaintiff presented with a depressed mood and sad affect, and complained of feeling lonely and ruminating about past negative experiences. (See R. 332.)  On April 14, Plaintiff again had a depressed mood and sad affect. (See R. 333.)  She was tearful and anxious, and talked about how she isolates herself. (See id.)

On April 17, 2003, Dr. Mejia prepared a Treatment Plan Review, which listed Plaintiff's GAF score as 65. (See R. 316.)  A GAF score in the range of 61-70 range denotes "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, OR school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." DSM-IV-TR at 34.

On April 18, Plaintiff was feeling anxious, depressed, and sad. (See R. 334.)  On April 21, Plaintiff was mildly depressed and in an anxious mood with corresponding affect; she told Rivera that

16

she was hurt and angry. (See R. 335.)  On April 23, Plaintiff was
calm and able to sleep well, but her mother's planned move to
Puerto Rico was triggering depressive symptoms and panic attacks.
(See R. 336.)  On April 28, Plaintiff complained of being scared
and unable to sleep well; she was agitated with a rapid heart beat,
sweating, and trembling hands; her feelings of loneliness were
worsening, and she became tearful when recalling memories of abuse.
(See R. 337.)  On April 30, Dr. Mejia wrote that Plaintiff
complained of trouble sleeping, was still in crisis, and had panic-
like symptoms; he found no acute change in her mental status, and
planned to continue the same treatment as before. (See R. 338.)

On May 2, 2003, Plaintiff was in a mild anxious mood with
corresponding affect; she had been able to sleep well and felt
rested at the session, but reported feeling confused. (See R. 339.)
On May 5, Plaintiff was experiencing mixed emotions, but denied
feeling irritated. (See R. 340.)  On May 16, Plaintiff was in a
mild depressed/anxious mood with corresponding affect. (See R.
343.)  On May 19, the attending therapist wrote, "[Plaintiff]
expressed feeling relief from her depressive symptoms.  She said
the medication is helping her a lot.  She appeared very calmed and
relaxed.  She said her impulsive behavior has also diminished."[6]
(R. 343-44.)  Then, on May 28, Plaintiff was in a depressed mood

_____

[6]At this particular appointment, Plaintiff met with a
different therapist and not with Rivera.

with corresponding affect and complained of not feeling well. (<u>See</u> R. 344.)

On June 2, 2003, Plaintiff began taking 300 mg of Neurontin, an anti-convulsant. (<u>See</u> R. 346.) On June 10, Plaintiff reported feeling sad about her abusive history and became tearful; Rivera discussed the need for biweekly sessions with Plaintiff. (<u>See</u> R. 347.) On June 12, Plaintiff stated that she felt calm performing household chores and keeping to herself. (<u>See</u> R. 348.) On June 16, she said that she was sleeping well, but was experiencing anxiety and headaches; she denied having any recent anger outbursts and expressed optimism about being able to cope with anger more appropriately. (<u>See</u> R. 348, 350.) On June 27, Plaintiff was in an anxious mood with agitated affect; she was irritable and sad, and discussed how her past experiences triggered fear. (<u>See</u> R. 349-50.)

On July 7, 2003, Plaintiff was calm and in a euthymic mood; however, Plaintiff complained of recurring nightmares and became tearful during the session. (<u>See</u> R. 351.) On July 17, Plaintiff was in low spirits and said she felt irritable; she continued to obsess about her past negative experiences and became tearful. (<u>See</u> R. 352.) Dr. Mejia also prepared another Treatment Plan Review on July 17, and he again recorded Plaintiff's GAF score as 65. (<u>See</u> R. 320.) However, Dr. Mejia concluded that Plaintiff was still exhibiting PTSD symptoms which affected her daily routine and relationships to the extent that mental health treatment needed to

18

be continued. (See R. 320, 323.)   On July 21, Plaintiff was
experiencing unpleasant feelings and a sense of worthlessness
caused by ruminations about her abusive past. (See R. 352)   On July
28, she was still agitated and having nightmares. (See R. 354.)

On August 1, 2003, Plaintiff was in a mild depressed mood, and
became tearful when discussing her family situation, but left
therapy feeling more calm. (See R. 354-55.)   Dr. Mejia found
Plaintiff to be stable on August 5, and she reported no complaints.
(See R. 356.)   On August 11, Plaintiff was in a mild depressed mood
and felt lonely, but also reported that she had not had any anger
outbursts. (See R. 357.)   On August 27, Plaintiff said that her
worsening relationship with her husband was causing depressive
symptoms, isolation, and sadness. (See R. 358.)

On September 5, 2003, Dr. Mejia noted that Plaintiff was
impulsive and having trouble sleeping; he found no acute change in
her situation and decided on continuing the same course of
treatment. (See R. 360.)   On September 9, Plaintiff was in a
depressed mood with sad affect and tearfully described how she felt
inadequate. (See R. 361.)   Rivera encouraged her to appropriately
express her feelings of hurt and anger, and Plaintiff was receptive
and cooperative to this therapy. (See id.)   On September 12, she
felt sadness due to her marital problems. (See R. 361-62.) On
September 15, Plaintiff was in low spirits and stated that her
conflicts with her husband were affecting her sleep; she became

tearful when expressing her desire to have an anger outburst. (See R. 362.) On September 17, Dr. Mejia noted that Plaintiff had no complaints and was experiencing no side effects. (See R. 363.) On September 22, Plaintiff was sad and tearful; she talked about how she was trying to control her rage and her desire to have anger outbursts. (See R. 364.) On September 26, Rivera described Plaintiff as being in a labile mood, smiling with intermittent bursts of crying spells; Plaintiff said she felt like a failure. (See id.) On September 29, she was in low spirits and ruminated about her past, but also reported that she now had more communication with her family, and that she was motivated to work on feeling better. (See R. 365.)

On October 6, 2003, Plaintiff was depressed and somewhat agitated, and her speech was pressured; she reported that she had cried for over an hour the day before with thoughts of her traumatic experiences racing through her head, but that she was grateful for all the help treatment had given her. (See R. 366.) On October 10, Dr. Mejia noted that Plaintiff was thinking too much and feeling sad. (See R. 367.) On October 13, she was in low spirits and tearful, having, the day before, relived an episode of physical abuse at the hands of her mother. (See R. 368.) On October 17, 2003, Dr. Mejia prepared the final Treatment Plan Review contained in the record. (See R. 324-28.) He recorded that Plaintiff's GAF score remained 65, but also determined that

Plaintiff's continuing reports of multiple depressive symptoms required ongoing psychiatric treatment. (See R. 324, 327.) On October 20, Plaintiff was irritated with pressured speech, relating that she felt used and hurt by the actions of her husband. (See R. 369.) On October 24, Rivera noted that Plaintiff was in higher spirits. (See id.) On October 27, Plaintiff was calm and said that she was making new friends and feeling better about herself. (See R. 370.)

On November 7, 2003, Plaintiff was in a mild depressed mood with corresponding affect and spoke of feeling sad. (See id.) Dr. Mejia noted no complaints or acute changes in Plaintiff's condition on November 14. (See R. 371.) On November 21, Plaintiff was calm, pleasant, and cooperative; Rivera wrote that she has "days in which she can't stop crying thinking about all her past negative experiences" and had cried for two hours the day before, but was also having better days and "in her good days she's making new friends and is beginning to not feel like a nobody." (R. 372.)

On December 2, 2003, Plaintiff was agitated and had pressured speech (see R. 372-73), but then appeared calmer and hopeful during her final recorded therapy session on December 9 (see R. 373).

Despite the significant improvement in Plaintiff's GAF score from 50 to 65, therapy notes reveal that her condition vacillated between good days and bad days, with the majority being bad days, and with multiple symptoms surfacing even on the "good" days.

21

Apart from Dr. Mejia, on May 21, 2002, Plaintiff also received a consultative evaluation from SSA psychiatrist Dr. Luigi Marcuzzo. (See R. 24, 189-90; Plaintiff's Memorandum of Law ("Pl.'s Mem."), at 5-6.) Dr. Marcuzzo found:

> [Plaintiff's s]peech is relevant and coherent. No delusions, auditory hallucinations "calling my name." She has frequent flashbacks. She has nightmares. Mood depressed, affect constricted. She complains of low energy. She complains of feeling hopeless, helpless and worthless. Oriented times three. Memory, recent adequate; remote, some impairment. She has scanty memory for important events in her life. Attention and concentration, some impairment; easily distractible. Serial sevens unable to perform. Calculations are at the kindergarten level. Insight and judgment are adequate.
> (R. 190.)

Additionally, Dr. Marcuzzo diagnosed Plaintiff with PTSD and a learning disability, stating that her symptoms were consistent with the findings of the interview. He also noted that her depression causes some limitation with regard to her memory and understanding, sustained concentration and persistence, and social interaction and adaptation. (See id.) Finally, Dr. Marcuzzo concluded that Plaintiff may benefit from psychiatric treatment, and that the prognosis was fair. (See id.)

On June 3, 2002, Dr. C. Richard Nobel, another consultative SSA psychiatrist, reviewed written information about Plaintiff. (See R. 24-25, 191-93, 201-07; Defendant's Memorandum of Law ("Def.'s Mem."), at 7.) Dr. Nobel conducted a Mental Residual Functional Capacity Assessment without examining Plaintiff in person (see Pl.'s Mem. at 6), and concluded that Plaintiff had anxiety-related (i.e.

depressive disorder) and affective (i.e. PTSD) disorders that did not satisfy the diagnostic criteria in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Appendix 1") §§ 12.04, 12.06. (See R. 201-03.) Plaintiff would have been automatically presumed disabled if she had satisfied these criteria and met the duration requirement. (See 20 C.F.R. §§ 404.1520(a)(4)(iii),(d); 416.920(a)(4)(iii),(d).)

Dr. Noble also concluded that Plaintiff's depressive disorder, learning disability, and PTSD caused a moderate limitation in Plaintiff's ability to maintain social functioning and mild limitations in Plaintiff's ability to engage in activities of daily living and to maintain concentration, persistence, and pace. (See R. 204.) Specifically, Dr. Noble found moderate limitations in Plaintiff's ability to understand and remember detailed instructions; carry out detailed instructions; maintain attention and concentration for extended periods; complete a normal workday and workweek without interruptions from psychologically based symptoms, and perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; accept instructions, and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; maintain socially appropriate behavior, and adhere to basic standards of neatness and cleanliness; respond appropriately to changes in the work setting; and set realistic goals or make plans independently

of others. (See R. 191-92.)  Dr. Noble found no abilities in which Plaintiff had marked limitation. (See id.)

Notably, Dr. Nobel's assessment of the evidence did not include any records or reports from Dr. Mejia. (See R. 192; Pl.'s Mem. at 15, n.21.)

    2.  <u>Physical Health</u>

Dr. Susan Moscou, a family specialist, began treating Plaintiff for asthma in August 2000, and continued to meet with Plaintiff every three months. (See R. 208, 212.)  On July 18, 2002, Dr. Moscou completed a Medical Source Statement in which she evaluated Plaintiff's physical ability to perform work-related activity. (See R. 209-12.)  In the Medical Source Statement, Dr. Moscou concluded that Plaintiff's abilities were limited by her asthma, so that she could occasionally or frequently lift and carry only up to ten pounds, and stand and walk for no more than six hours out of an eight hour work day. (See R. 209.)  Additionally, Dr. Moscou found that Plaintiff's asthma limited her ability to endure temperature extremes, dust, humidity/wetness, hazards like machinery and heights, and fumes and odors. (See R. 212.)

Dr. Peter Graham, who specializes in internal medicine, performed a consultative examination of Plaintiff on May 16, 2002. (See R. 24, 175; Def.'s Mem. at 6.)  Dr. Graham had Plaintiff describe her history of asthma to him, and stated that her "[a]sthma attacks usually occur with changes in weather or with physical

exertion." (R. 175.)   Dr. Graham determined that Plaintiff had adequate muscle strength; clear breathing sounds with no wheezing; a pulmonary function test within normal limits; and the ability to sit, stand, walk, lift, carry, handle objects, hear, and speak. (<u>See</u> R. 176-77.)

III. <u>The ALJ's Decision</u>

The ALJ found that Plaintiff's PTSD and bronchial asthma are severe but not severe enough to meet or medically equal one of the impairments listed in Appendix 1. (<u>See</u> R. 19.)   The ALJ further determined that Plaintiff has moderate limitations in maintaining social functioning, and only mild limitations in activities of daily living and in maintaining concentration, persistence, or pace. (<u>See</u> R. 19-20.)   The ALJ noted that "there is little in the record to suggest that [Plaintiff] would be unable to function with co-workers or reasonable supervision in a low stress work environment in which she did not have to deal with the public." (R. 26)   Thus, the ALJ concluded that Plaintiff has the residual functional capacity to "work at all exertional levels with low stress, no extended concentration, no environmental irritants, no requirement of speaking English, and SVP [Specific Vocational Preparation] of 2." (<u>See</u> R. 20.)[7]

_____

[7]In the Dictionary of Occupational Titles, an SVP of 2 indicates a job that requires "anything beyond a short demonstration up to and including 1 month." (Add. to Pl.'s Mem. at A-2, B-2, C-2.)

The ALJ acknowledged that Plaintiff had no work experience in the last fifteen years and so the burden shifted to the Commissioner to show that Plaintiff had "the residual functional capacity to perform other jobs existing in significant numbers in the national economy." (See R. 26.)  With the advice of a vocational expert who accounted for Plaintiff's non-exertional limitations, the ALJ found that work does exist in significant numbers in the national economy that could be performed by Plaintiff, and therefore concluded that she was not disabled, as defined by the Social Security Act (20 CFR § 416.920(g)).[8] (See R. 27.)

In reaching this decision, the ALJ rejected almost all of the evidence gathered by Dr. Mejia, Plaintiff's treating psychiatrist, about her mental health. (See R. 25.)  The ALJ explained that Dr. Mejia's assessment of Plaintiff was "less than convincing," as Dr. Mejia frequently described her as being stable, conducted few mental health evaluations while recording numerous symptoms, and was not a board certified psychiatrist. (See id.)  The ALJ also saw an inconsistency between Dr. Mejia's reports of Plaintiff's markedly limited abilities and her consistent GAF scores of 65. (See id.)  The ALJ also rejected the therapists' notes, another

---

[8]Specifically, the jobs recommended by the vocational expert for Plaintiff were hand packer (D.O.T. 920.521-018), final assember (D.O.T. 789.687-046), and cafeteria attendant (D.O.T. 311.677-010). (See R. 27, 62-63; Add. to Pl.'s Mem. at A1-C4.)

treating source that was consistent with the reports of Dr. Mejia. The ALJ thus accepted the consultative physician's assessment, which the ALJ stated was contradictory to Dr. Mejia's, as it found that Plaintiff had some impairment with regard to her remote memory, attention, and concentration, but otherwise had normal mental health. (See id.)

The ALJ also refused to give controlling weight to Dr. Moscou's report about Plaintiff's physical health, finding that she provided no medical basis for Plaintiff's exertional limitations. (See R. 26.) Instead, the ALJ concluded that Plaintiff's asthma was stable, as she had not been hospitalized or visited an emergency room. (See id.)

Finally, the ALJ found that the degree of functional limitation was not as great as alleged by Plaintiff, observing that Plaintiff maintained a relationship with her second husband and was able to care for her adolescent son. (See R. 25.) The ALJ found that Plaintiff's "relationship with her husband, as reflected in the treating notes, has had its ups and downs, including some violence on the part of the claimant, it appears nonetheless to be stable and, for the most part, beneficial to the claimant." (R. 25.) The ALJ's finding is not at all supported by the record. Instead, the record reflects Plaintiff's inability to live with her husband because of her emotional disabilities. (See R. 59, 262.) Plaintiff's husband insults and humiliates her. (See R. 289, 293.)

Plaintiff had a violent response to her husband's infidelities, which triggered flashbacks of her abusive relationship with her ex-husband. (See R. 286-87, 290, 292.) In therapy, Plaintiff reported a "constricted relationship [with her] husband[, which] caus[es] some depressive symptoms, social isolation[, and] sadness." (R. 358; see also R. 286, 293, 357.)

The ALJ also questioned Plaintiff's credibility based on her responses to questions about her education and work history. (See R. 26.)

## DISCUSSION

Plaintiff argues that the Commissioner's decision should be reversed because the decision is based on a legal error and not supported by substantial evidence, as 1) the ALJ failed to properly evaluate medical opinion evidence and instead impermissibly substituted his own medical opinion; 2) the ALJ failed to develop the record; and 3) the Commissioner failed to meet her burden of proving that Plaintiff can perform work in the national economy. (See Pl.'s Mem. at 1, 12, 17, 19.)

Defendant contends that substantial evidence supports the ALJ's findings that 1) Plaintiff's impairments were not severe enough to meet the requirements of Appendix 1; 2) Plaintiff retained the residual functional capacity to work at all exertional levels; 3) Plaintiff's subjective complaints were not credible; and 4) Plaintiff was able to perform work in the national economy. (See

Def.'s Mem. at 12, 14, 17, 19.)  Thus, Defendant contends that the
Commissioner's decision should be affirmed. (See id. at 1.)

I.   Governing Law

For purposes of SSI eligibility, a person is disabled if he or
she is unable "to engage in any substantial gainful activity by
reason of any medically determinable physical or mental impairment
which can be expected to result in death or which has lasted or can
be expected to last for a continuous period of not less than twelve
months."  42  U.S.C.  §§  423(d)(1)(A),  1382c(a)(3)(A).    An
individual's physical or mental impairment is not disabling under
the Act unless it is "of such severity that he is not only unable
to do his previous work but cannot, considering his age, education,
and work experience, engage in any other kind of substantial
gainful work which exists in the national economy."  Id. §§
423(d)(2)(A), 1382c(a)(3)(B).

The applicable regulations promulgated by the SSA set forth a
five-step sequence to evaluate disability claims. See 20 C.F.R. §
404.1520.   The  Second  Circuit  has  explained  the  sequential
evaluation process as follows:

> First, the SSA considers whether the claimant is
> currently engaged in substantial gainful employment.  If
> not, then the SSA considers whether the claimant has a
> "severe impairment" that significantly limits the
> "ability to do basic work activities."  If the claimant
> does suffer such an impairment, then the SSA determines
> whether this impairment is one of those listed in
> Appendix 1 of the regulations.   If the claimant's
> impairment is one of those listed, the SSA will presume
> the claimant to be disabled.  If the impairment is not so

listed, then the SSA must determine whether the claimant possesses the "residual functional capacity" to perform his or her past relevant work.  Finally, if the claimant is unable to perform his or her past relevant work, then the burden shifts to the SSA to prove that the claimant is capable of performing "any other work."

Schaal v. Apfel, 134 F.3d 496, 501 (2d Cir. 1998) (citing 20 C.F.R. §§ 404.1520, 416.920); accord Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996)) (footnote omitted); Tejada v. Apfel, 167 F.3d 770, 774 (2d Cir. 1999); Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999); DeChirico v. Callahan, 134 F.3d 1177, 1179-80 (2d Cir. 1998).

The claimant has the burden of proof as to the first four steps in the evaluation. See Green-Younger v. Barnhart, 335 F.3d 99, 106 (2d Cir. 2003); Perez, 77 F.3d at 46; Shaw v. Chater, 221 F.3d 126, 132 (2d Cir. 2000).  The Commissioner has the burden of proving, at the fifth step, that there exists substantial gainful employment in the national economy that the claimant can perform. See Green-Younger, 335 F.3d at 106; Perez, 77 F.3d at 46; Parker v. Harris, 626 F.2d 225, 231 (2d Cir. 1980).

This Court may set aside a determination by the Commissioner only if it is based on legal error or is not supported by substantial evidence.  See 42 U.S.C. § 405(g); Pollard v. Halter, 377 F.3d 183, 188 (2d Cir. 2004); Machadio v. Apfel, 276 F.3d 103, 108 (2d Cir. 2002); Shaw, 221 F.3d at 131; Rosa, 168 F.3d at 77. If there is substantial evidence to support the Commissioner's findings, they are conclusive. See 42 U.S.C. § 405(g); Quinones v. Chater, 117 F.3d 29, 33 (2d Cir. 1997).

The Supreme Court has defined the term "substantial evidence" to mean "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support such a conclusion.'" Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427 (1971) (quoting Consolidated Edison v. N.L.R.B., 305 U.S. 197, 229, 59 S. Ct. 206, 217 (1938)); see also Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004); Pollard, 377 F.3d at 188.

To determine whether the ALJ's findings are supported by substantial evidence, the Court "must first be satisfied that the claimant has had a full hearing under the [Commissioner's] regulations and in accordance with the beneficent purposes of the Act." Cruz v. Sullivan, 912 F.2d 8, 11 (2d Cir. 1990) (internal quotations and citations omitted); see also Donato v. Sec'y of Dept. of Health and Human Servs., 721 F.2d 414, 418 (2d Cir. 1983); Lopez v. Apfel, No. 98 Civ. 9036 (RPP), 2000 WL 633425, at *6 (S.D.N.Y. May 17, 2000); Duverge v. Apfel, No. 97 Civ. 7131 (RCC), 1999 WL 178780, at *6 (S.D.N.Y. Mar. 31, 1999). "Because a hearing on disability benefits is a non-adversarial proceeding, the ALJ generally has an affirmative obligation to develop the administrative record." Perez, 77 F.3d at 47; see also Shaw, 221 F.3d at 131; Tejada, 167 F.3d at 774; Rosa, 168 F.3d at 79; Duverge, 1999 WL 178780, at *6. Under the regulations, the ALJ must develop the plaintiff's "complete medical history" and make "every reasonable effort" to help the plaintiff get the required medical reports. 20 C.F.R. § 404.1512(d); see also Perez, 77 F.3d

at 47; <u>Echevarria v. Apfel</u>, 46 F. Supp.2d 282, 291 (S.D.N.Y. 1999); <u>Gallardo v. Apfel</u>, No. 96 Civ. 9435 (JSR), 1999 WL 185253, at *4 (S.D.N.Y. Mar. 25, 1999).

Furthermore, "[a]n administrative determination by the SSA cannot be upheld when based on an erroneous view of the law that improperly disregards highly probative evidence." <u>Grey v. Heckler</u>, 721 F.2d 41, 44 (2d Cir. 1983); <u>see also</u> <u>Marcus v. Califano</u>, 615 F.2d 23, 27 (2d Cir. 1979); <u>Castillo v. Apfel</u>, No. 98 Civ. 0792 (LAK) (JCF), 1999 WL 147748, at *5 (S.D.N.Y. Mar. 18, 1999). "Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles." <u>Schaal</u>, 134 F.3d at 504 (quoting <u>Johnson v. Bowen</u>, 817 F.2d 983, 986 (2d Cir. 1987)).

Highly probative evidence includes the opinion of a claimant's treating source. The opinion of a treating source must be given controlling weight if it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); <u>see also</u> <u>Halloran</u>, 362 F.3d at 32; <u>Green-Younger</u>, 335 F.3d at 106.

When a treating source's opinion is not given controlling weight, the SSA must assess the following factors in determining

how much weight to afford that opinion: (1) the frequency of examination and the length, nature, and extent of the treatment relationship; (2) the evidence in support of the opinion; (3) the opinion's consistency with the record as a whole; (4) whether the opinion is from a specialist; and (5) other relevant factors. See Schaal, 134 F.3d at 503 (citing 20 C.F.R. §§ 404.1527(d)(2)-(6), 416.927(d)(2)-(6)).  The ALJ must provide "good reasons in [the SSA's] notice of determination or decision for the weight [the SSA gave the] treating source's opinion." 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); accord Schaal, 134 F.3d at 503 (remand necessary because ALJ did not state valid reasons for not crediting opinion of treating source).

Finally, "an ALJ cannot reject a treating [source]'s diagnosis without first attempting to fill any clear gaps in the administrative record." Rosa, 168 F.3d at 79.  The Social Security regulations require the ALJ to "seek additional evidence or clarification from [claimant's] medical source when the report from [claimant's] medical source contains a conflict or ambiguity that must be resolved, the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques."  20 C.F.R. § 416.912(e)(1); see also Clark v. Comm'r of Social Security, 143 F.3d 115, 117-18 (2d Cir. 1998) (failure of ALJ "to seek clarifying information concerning the perceived inconsistencies" within the reports of a treating source posed "to say the least, a serious

question as to whether the ALJ's duty to develop the administrative record was satisfied in this case.").

A.   Whether Plaintiff's Impairment Meets a Listing

Plaintiff fails to explicitly challange the ALJ's determination that Plaintiff's impairments are not severe enough for her to be automatically presumed disabled under Appendix 1, while Defendant contends that substantial evidence supports this determination. (See Def.'s Mem. at 12.)   However, resolution of this issue hinges on whether Dr. Mejia's findings should be given controlling weight.   Appendix 1, § 12.06 deals with anxiety disorders.   This section provides:

12.06 Anxiety Related Disorders: In these disorders anxiety is either the predominant disturbance or it is experienced if the individual attempts to master symptoms; for example, confronting the dreaded object or situation in a phobic disorder or resisting the obsessions or compulsions in obsessive compulsive disorders.

The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in both A and C are satisfied.

A. Medically documented findings of at least one of the following:

1. Generalized persistent anxiety accompanied by three out of four of the following signs or symptoms:

a. Motor tension; or
b. Autonomic hyperactivity; or
c. Apprehensive expectation; or
d. Vigilance and scanning;

Or

2. A persistent irrational fear of a specific object, activity, or situation which results in a compelling desire to avoid the dreaded object, activity, or situation; or
3. Recurrent severe panic attacks manifested by a

34

sudden unpredictable onset of intense apprehension, fear, terror and sense of impending doom occurring on the average of at least once a week; or
4. Recurrent obsessions or compulsions which are a source of marked distress; or
5. Recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress;

And

B. Resulting in at least two of the following:

1. Marked restriction of activities of daily living; or
2. Marked difficulties in maintaining social functioning; or
3. Marked difficulties in maintaining concentration, persistence, or pace; or
4. Repeated episodes of decompensation, each of extended duration.

Or

C. Resulting in complete inability to function independently outside the area of one's home.

20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.06.

If Dr. Mejia's findings are given the controlling weight Plaintiff contends they are entitled to (See Pl.'s Mem. at 12-13), it is conceivable that Plaintiff would qualify as disabled under Appendix 1. Indeed, on September 16, 2002, Dr. Mejia wrote that Plaintiff "reports unwanted intrusive recollections in images, thoughts and perceptions of her past abusive history . . . irritability, anger outbursts, difficulty concentrating, depressed and anxious mood, decrease [sic] energy level, feeling worthless and sad, auditory and visual hallucinations." (R. 309.) Dr. Mejia's evaluation, substantiated by progress notes from

Plaintiff's therapy sessions,[9] could fulfill the requirement of Appendix 1, § 12.06, A-5.

Furthermore, as noted above, Dr. Mejia found that Plaintiff has multiple marked limitations with regard to sustained concentration and persistence, as well as social interaction (see R. 312-14), which could fulfill the requirement of Appendix 1, § 12.06, B-2 and B-3.[10]  Plaintiff's qualification for an Appendix 1

---

[9]Plaintiff reported unwanted intrusive recollections of past abusive history that included flashbacks (see R. 247, 249, 260, 262-63, 285, 290, 368), and ruminations about her past (see R. 246, 254-55, 260, 279, 329, 332, 352, 365-68, 372), and constantly experienced irritability (see R. 247, 259, 263, 287, 349, 352, 369), anger (see R. 254, 271, 283, 289, 293, 335, 362, 364), difficulty concentrating (see R. 249, 254-55), sadness and depression (see R. 248, 254-55, 276-78, 281-82, 286, 332-34, 336, 344, 347, 352, 354-55, 358, 361-62, 364-68, 370), anxiety (see R. 254-55, 258-59, 263, 265-66, 283, 331, 333-34, 348-50), decreased energy (see R. 291), feelings of worthlessness (see R. 329, 352, 361, 364), and paranoid hallucinations (see R. 260, 285).

[10]With regard to social interaction, Dr. Mejia found marked limitations in Plaintiff's ability to interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; maintain socially appropriate behavior, and adhere to basic standards of neatness and cleanliness; and an extreme limitation in Plaintiff's ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. (See R. 314.)
    With regard to sustained concentration and persistence, he found marked limitations in Plaintiff's ability to carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; and extreme limitations in Plaintiff's ability to sustain an ordinary routine without special supervision; work in coordination with or proximity to others without being distracted by them; complete a normal workday and workweek without interruptions from psychologically based symptoms, and to perform at a consistent pace without unreasonably lengthy rest periods. (See R. at 312-13.)

36

disability thus depends on 1) whether Dr. Mejia's findings are given controlling weight, and if so, 2) for how long the findings in the September 16, 2002 evaluation provide an accurate description of her condition.

B. <u>Controlling Weight</u>

As discussed, a treating source's opinion must be given controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). If the treating source's opinions are not given controlling weight, the ALJ must assess the following when determining the weight he or she should be afforded: (1) the frequency of examination and the length, nature, and extent of the treatment relationship; (2) the evidence in support of the opinion; (3) the opinion's consistency with the record as a whole; (4) whether the opinion is from a specialist; and (5) other relevant factors. See <u>Schaal</u>, 134 F.3d at 503 (citing 20 C.F.R. §§ 404.1527(d)(2)-(6), 416.927(d)(2)-(6)).

This Court finds that Dr. Mejia's findings should have been given controlling weight, and that Dr. Moscou's might be entitled to controlling weight after further development of the record. The ALJ committed a legal error in according almost no weight to their findings.

1. <u>Dr. Mejia</u>

Despite the fact that Dr. Mejia was Plaintiff's treating psychiatrist, the ALJ decided not to give his findings controlling weight because (1) he "frequently noted no complaints and found [Plaintiff] to be stable," and (2) "the treating source records note mostly symptoms and few mental status evaluations." (R. 25.) In finding that Plaintiff was not disabled under the Social Security Act, the ALJ instead gave more weight to the opinion of Dr. Marcuzzo, a consultative physician who evaluated Plaintiff on just one occasion and found "some limitations" in her memory and understanding, sustained concentration and persistence, and social interaction and adaption caused by depression, without describing the extent of these limitations.[11] (See R. 190.) The ALJ committed a legal error by failing to give Dr. Mejia's opinion controlling weight.

First, Dr. Mejia's conclusions were well-supported by medically acceptable diagnostic tools. Dr. Mejia was Plaintiff's treating psychiatrist, and in this role he met with Plaintiff on an almost monthly basis. (See R. 245-96, 329-74.) Dr. Mejia also prepared Condition Status Reports about Plaintiff in December 2002 and March 2003 (see R. 222, 305, 307); Treatment Plan Reviews in

---

[11]Dr. Nobel's report, presumably based on Dr. Marcuzzo's evaluation, did assess Plaintiff's limitations as being no worse than moderate. (See R. 191-93.) However, Dr. Nobel, another consultative physician working for the SSA, never evaluated Plaintiff personally (see Pl.'s Mem. at 6; Def.'s Mem. at 7), and the ALJ's opinion does not indicate how much weight Dr. Nobel's report is given.

July and October 2002, and January, April, July, and October 2003
(see R. 232-44, 316-28); and the Physician's Report in September
2002 (see R. 308-15). Thus, the ALJ's statement that few mental
status evaluations were performed is not supported by the record.
(See R. 25.)

Furthermore, Dr. Mejia's opinion was supported by the
medically acceptable diagnostic tool of Plaintiff's therapy notes,
which documented extensively Plaintiff's reported symptoms and the
therapist's evaluation of Plaintiff's condition. The ALJ's finding
that "the treating source records note mostly symptoms" should not
have weakened Plaintiff's claim, "as [a] patient's report of
complaints, or history, is an essential diagnostic tool." Green-
Younger, 335 F.3d at 107 (quoting Flanery v. Chater, 112 F.3d 346,
350 (8th Cir. 1997)). Throughout the course of her treatment,
Plaintiff's therapists, along with Dr. Mejia, noted the following
symptoms: tearfulness (see R. 245-46, 254-55, 262, 265, 272, 281-
82, 287, 291, 293, 329, 331, 333, 337, 347, 351-52, 354-55, 361-62,
364, 366, 368, 372); nightmares of past abuse (see R. 247, 251,
259, 260, 283, 285, 329, 351, 354); flashbacks of past abuse (see
R. 247, 249, 260, 262-63, 285, 290, 368); depression and/or sadness
(see R. 248, 254-55, 276-78, 281-82, 286, 332-34, 336, 344, 347,
352, 354-55, 358, 361-62, 364-68, 370); anxiety (see R. 254-55,
258-59, 263, 265-66, 283, 331, 333-34, 348-50); irritability (see
R. 247, 259, 263, 287, 349, 352, 369); ruminations about past
traumatic events (see R. 246, 254-55, 260, 279, 329, 332, 352, 365-

68, 372); anger (see R. 254, 271, 283, 289, 293, 335, 362, 364); isolation (see R. 245, 254-55, 333, 358); forgetfulness (see R. 248, 254-55); confusion (see R. 339); concentration problems (see R. 249, 254-55); agitation (see R. 258-59, 266, 283, 331, 337, 350, 354, 373); pressured speech (see R. 366, 369, 373); feelings of worthlessness (see R. 329, 352, 361, 364); paranoia (see R. 260, 285); loneliness (see R. 332, 337, 357); trouble sleeping (see R. 273, 291, 337-38, 360, 362); guilt (see R. 291); lack of appetite (see id.); and lack of energy (see id.). These symptoms were both reported by Plaintiff and observed by the therapists and Dr. Mejia. Indeed, based on his professional assessment of Plaintiff's symptoms, Dr. Mejia prescribed for Plaintiff various anti-depressants and anti-psychotic medications. (See R. 223-26.) The ALJ improperly disregarded the importance of these symptoms, and incorrectly viewed them as evidence that Plaintiff's treating source had not performed enough formal mental status evaluations. The extensive treatment notes show that Dr. Mejia's conclusions were "well-supported by medically acceptable clinical and laboratory diagnostic techniques . . ." 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

Second, Dr. Mejia's opinion is not inconsistent with other substantial evidence in the record. The therapy notes, which all support Dr. Mejia's findings, constituted the majority of the record. The ALJ nevertheless found Dr. Mejia's determination that Plaintiff could not work to be inconsistent with his assessment

that Plaintiff's GAF score was 65. (See R. 25.)  However, these findings are not inconsistent.  The Physician's Report, which detailed Plaintiff's limitations and found them to be marked or extreme, was prepared on September 16, 2002. (See R. 312-15.)  In this very same Physician's Report, Dr. Mejia noted that Plaintiff's GAF score was 50, which denotes "[s]erious symptoms...OR any *serious* impairment in social, occupational, or school functioning (e.g. no friends, unable to keep a job)." DSM-IV-TR 34; compare id. (GAF range 51-60 indicates *moderate* difficulties in functioning) (emphasis added).  Marked and extreme limitations and a 50 GAF score are not inconsistent.  Furthermore, Dr. Mejia's last chronological assessment that Plaintiff was unable to work, occurred on March 28, 2003. (See R. 222, 305).  It was not until April 2003 that Dr. Mejia assessed Plaintiff's GAF score to be 65. (See R. 316.)  Therefore, Dr. Mejia did not contradict himself in his findings.

Dr. Mejia's findings are not even entirely inconsistent with the findings of the consultative medical sources.  On May 21, 2002, Dr. Marcuzzo noted that Plaintiff's "allegations [were] consistent with the findings of the interview.  Memory and understanding, sustained concentration and persistence, social interaction and adaptation, some limitation because of depression." (R. 190.)  Both doctors therefore found limitations, and while Dr. Marcuzzo did state that some limitation exists, he neither offered a precise degree of these limitations nor opined about Plaintiff's ability to

work.  Notably, Dr. Marcuzzo did find that Plaintiff's learning disability caused her to perform calculations at a kindergarten level, and that she was unable to perform serial sevens. (See R. 190.)  Dr. Marcuzzo also noted that Plaintiff may benefit from psychiatric treatment. (See id.)  Only Dr. Nobel, a non-examining consultant who merely reviewed written evidence about Plaintiff, attempted to define her limitations (see R. 191-93), and his opinion is entitled to less weight than that of an examining source. See 20 C.F.R. § 416.927(d)(1); Gonzalez v. Apfel, 113 F. Supp. 2d 580, 589 (S.D.N.Y. 2000).

In sum, Dr. Mejia prepared a number of mental status evaluations throughout the course of Plaintiff's treatment - Condition Status Reports, Treatment Plan Reviews, and a Physician's Report.  His findings are supported by the therapists' progress notes, and are not inconsistent with other substantial evidence in the case record, as Dr. Marcuzzo agreed that Plaintiff had some limitations.  Thus, the ALJ should have given Dr. Mejia's opinion controlling weight, and committed a legal error by disregarding such highly probative evidence.

Yet, even if controlling weight had not been given to Dr. Mejia's opinions, the ALJ was wrong in assigning Dr. Mejia's opinion no weight at all.  Considering the relevant factors listed in Schaal, Dr. Mejia's opinion should have at least been given a great deal of weight, and certainly more weight than the opinions of Drs. Marcuzzo and Noble were given.

First, Dr. Mejia had an extensive relationship with Plaintiff, spanning a period of twenty months, which the ALJ did not appropriately take into account, particularly in comparison to the one-time consultative evaluations performed by Drs. Marcuzzo and Nobel. "[I]n evaluating a claimant's disability, a consulting physician's opinions or report should be given limited weight . . . . This is justified because 'consultative exams are often brief, are generally performed without benefit or review of claimant's medical history and, at best, only give a glimpse of the claimant on a single day . . . .'" Cruz, 912 F.2d at 13 (quoting Torres v. Bowen, 700 F.Supp. 1306, 1312 (S.D.N.Y. 1988)); see also Crespo v. Apfel, No. 97 Civ. 4777 (MGC), 1999 WL 144483, at *7 (S.D.N.Y. Mar. 17, 1999).

Next, as discussed above, a great deal of evidence from the therapists' progress notes support Dr. Mejia's opinion, and his opinion is not inconsistent with the record as a whole.

Finally, the ALJ stated that Dr. Mejia is not a board certified psychiatrist, and is therefore not a specialist. (See R. 25.) The regulations do not require board certification for a treating source to be considered a specialist. See 20 C.F.R. §§ 404.1527(d)(5). Whether board certified or not, Dr. Mejia is indeed a specialist in psychiatry. As such, he is capable of making psychiatric assessments, and his findings should not have been completely disregarded. Rather, the ALJ should have lent Dr. Mejia's opinion, at the very least, something close to controlling

43

weight.

Since (1) Dr. Mejia found Plaintiff unable to work from April 2002 to March 2003, (2) his findings are amply supported by the record, and (3) the ALJ's conclusions were not supported by substantial evidence, this Court finds that Plaintiff was disabled under the Social Security Act during that period. For that year, Dr. Mejia's findings clearly evince that Plaintiff did not have the residual functional capacity to work, as she had multiple marked and extreme limitations. Furthermore, such limitations might even have been severe enough to qualify for disability under Appendix 1, as discussed above.

Nevertheless, this Court cannot determine as a matter of law, based upon the current record, whether Plaintiff had the residual functional capacity to work from April to December 2003, as Dr. Mejia's findings during this period are ambiguous. Further development of the record is thus required.

Dr. Mejia prepared the Physician's Report about Plaintiff's limitations on September 16, 2002 (see R. 312-15), last opined about Plaintiff's ability to work on March 28, 2003 (see R. 222, 305), and first recorded a GAF score of 65 on April 17, 2003. (See R. 316.) It is quite possible that a combination of psychotherapy and medication improved Plaintiff's condition to the extent that she was able to maintain gainful employment by April 2003. It is also possible that Dr. Mejia's opinion of Plaintiff's ability to

work had changed when he assessed her GAF score to have increased fifteen points. On the other hand, Plaintiff's improvement may have merely been relative to her extreme or marked limitations, and did not reach the level of enabling her to work. Dr. Mejia did not opine on that subject after March 28, 2003. (See R. 222, 305.)

Progress notes from a variety of therapy sessions from April to December 2003 support the proposition that Plaintiff's condition was slowly but consistently improving. On April 23, Plaintiff was calm and able to sleep peacefully, but was also experiencing depressive symptoms and panic attacks. (See R. 336.) On May 19, 2003, a therapist standing in for Rivera described Plaintiff as appearing calm and relaxed, and Plaintiff also explained that she believed the medication was helping her with her depressive symptoms, and that her impulsive behavior had diminished. (See R. 343-44.) On June 16, Plaintiff denied having any recent anger outbursts, and expressed optimism about coping with anger appropriately. (See R. 348, 350.) On July 7, Plaintiff was calm and in a euthymic mood. (See R. 351.) On October 27, Plaintiff was calm, making new friends, and feeling better about herself in general. (See R. 370.) On November 21, Plaintiff reported that she felt like less of a "nobody" and was making new friends on her good days. (See R. 372.)

Even though Plaintiff's condition was improving, improvement is a relative term, and the progress notes reveal rough patches and set-backs at the majority of therapy sessions during this period.

Plaintiff and her therapist discussed a need for biweekly therapy sessions on June 10, 2003. (See R. 347.) Progress notes from two September 2003 therapy sessions record that Plaintiff desired to have an anger outburst (see R. 362), and that she was in a labile mood, both crying and smiling (see R. 364). On October 17, 2003, Dr. Mejia wrote in a Treatment Plan Review that Plaintiff needed to continue psychiatric treatment. (See R. 324-28.) Dr. Mejia's recommendation for continued treatment was proven correct at the therapy session on November 21, when Plaintiff stated that on her bad days, she could not stop crying while thinking about her past traumatic experiences. (See R. 372.) Plaintiff's PTSD symptoms clearly persisted up to April 2003 and beyond.[12]

It is unclear whether Dr. Mejia was of the view that Plaintiff's condition had improved and if so, whether it changed his opinion about Plaintiff's ability to work. If he persisted in his opinion that she was unable to work, the ALJ should have provided him with an opportunity to explain why he maintained such a position in spite of the improved GAF scores.

As discussed, "an ALJ cannot reject a treating [source]'s diagnosis without first attempting to fill any clear gaps in the administrative record." Rosa, 168 F.3d at 79. Instead, the Social Security regulations require the ALJ to "seek additional evidence

---

[12]All progress notes cited from R. 329-74 correspond to the period of April to December 2003. The specific symptoms Plaintiff exhibited during that period are described supra, at 39-40.

or clarification from [claimant's] medical source when the report from [claimant's] medical source contains a conflict or ambiguity that must be resolved . . . ."  20 C.F.R. § 416.912(e)(1).

By failing to seek clarification from Dr. Mejia about the change in Plaintiff's GAF scores and any perceived change in Plaintiff's previously diagnosed limitations, the ALJ neglected his duty to develop the administrative record as required under the Social Security regulations and by Second Circuit caselaw.

This Court concludes that it is necessary to further develop the record in order to determine whether Plaintiff's disability remained severe enough to prevent her from working during the period of April through December 2003.

2.  <u>Dr. Moscou</u>

The ALJ also did not lend controlling weight to the opinion of Dr. Moscou, Plaintiff's treating physician for her asthma. (<u>See</u> R. 26.)  The ALJ stated that Dr. Moscou provided no medical basis for her findings that Plaintiff's asthma created exertional limitations with regard to her ability to lift and carry weight, and stand and walk for hours at a time. (<u>See</u> R. 24, 26.)  The only other evaluation of Plaintiff's asthmatic condition was made by Dr. Graham, a consultative physician who performed a pulmonary function test on Plaintiff that was within normal limits. (<u>See</u> R. 177.) Presumably, the ALJ lent more weight to the opinion of Dr. Graham than he did to the opinion of Dr. Moscou, as he found that Plaintiff's asthma limited her only "to work with a clean air

47

environment and no temperature extremes." (R. 26.)

This Court finds that the ALJ neglected his duty to properly develop the record when he determined that Dr. Graham's opinion should receive more weight than Dr. Moscou's.

When determining whether an individual is disabled, the SSA must "make every reasonable effort to obtain from the individual's treating physician (or other treating health care provider) all medical evidence, *including diagnostic tests*, necessary in order to properly make such determination, prior to evaluating medical evidence obtained from any other source on a consultative basis." 42 U.S.C. § 423(d)(5)(B) (emphasis added). Additionally, the SSA's regulations state: "[w]hen the evidence we receive from your treating physician . . . or other medical source is inadequate for us to determine whether you are disabled, . . . [w]e will first re-contact your treating physician . . . or other medical source to determine whether the additional information we need is readily available." 20 C.F.R. § 404.1512(e).

Thus, the ALJ's perfunctory statement that Dr. Moscou did not provide a medical basis for her findings violated his duty to develop the record, as he should have contacted Dr. Moscou to provide him with such information in order to determine the acceptability of her diagnostic techniques.

Furthermore, Dr. Moscou's opinion is not necessarily in conflict with other evidence in the record concerning Plaintiff's exertional limitations, namely the findings of Dr. Graham. While

finding Plaintiff's pulmonary function test to be within normal limits, Dr. Graham did note that Plaintiff had a history of asthma since childhood, with attacks usually occurring with changes in the weather or *with physical exertion*. (See R. 175-77.) Dr. Graham added that Plaintiff "is able to sit, stand, walk, lift, carry, handle objects, hear and speak." (R. 177.) But Dr. Graham never explained the extent to which Plaintiff can perform these activities. Indeed, as Plaintiff points out, the Commissioner conceded in a different case that a nearly identical statement from the same Dr. Graham was too vague for an ALJ to make a proper assessment of specific limitations on a claimant's ability to work. (See <u>Villaneuva v. Barnhart</u>, No. 03 Civ 9021 (JGK), 2005 WL 22846, *9, (S.D.N.Y. Jan. 3, 2005) ("In this case, the ALJ relied on the February 20, 2002 report by Dr. Graham. That report simply recited that, 'This patient is able to sit, stand, walk, travel, lift, carry, handle objects, hear and speak.'"); <u>see also</u> Pl.'s Mem. at 19.) This Court likewise finds that such an ambiguous assessment does not satisfy the Commissioner's burden of demonstrating that Plaintiff is able to fully perform the activities described by Dr. Graham, without further clarification. <u>See</u> <u>Curry v. Apfel</u>, 209 F.3d 117, 123 (2d Cir. 2000) (holding that Commissioner's burden was not met where the only evidence presented was a vague statement by a physician).

Finally, even if Dr. Moscou's opinion is not given controlling weight after development of the record, her opinion should still be

accorded more weight than it was given at the December 10, 2003 hearing. Despite the lack of evidence in the record that she is a specialist, Dr. Moscou had a longstanding relationship with Plaintiff. Dr. Moscou had treated Plaintiff for her asthma every three months, for approximately two years, when she completed the Medical Source Statement that assessed Plaintiff's exertional limitations on July 18, 2002. (See R. 208-12.) In spite of this lengthy doctor-patient relationship, the ALJ gave Dr. Moscou's opinion almost no weight. (See R. 26.) Because of the length and extent of her treatment relationship with Plaintiff, this Court finds that Dr. Moscou's opinion is entitled to at least some weight in the determination of Plaintiff's exertional limitations. In any event, Dr. Moscou's opinion is only relevant to an inquiry of Plaintiff's exertional limitations from April 2003 forward, as this Court has already determined that Plaintiff was disabled from April 2002 to March 2003.

D.   Plaintiff's Residual Functional Capacity

The Commissioner argues that the ALJ's finding that Plaintiff was able to perform work in the national economy was correct, and cites as proof Plaintiff's daily activities of caring for her thirteen-year-old son, cleaning, cooking, shopping, watching television, listening to music, dressing and grooming herself, and traveling independently. (See Def.'s Mem. at 18.) The Commissioner adds, "[t]he fact the plaintiff was able to perform these daily activities belies her claim of disability." (Id.)

50

Had Plaintiff merely claimed to be physically disabled, the ALJ's conclusions may have merited some deference. However, given Plaintiff's severe psychiatric symptoms, Plaintiff's ability to care for herself at home is of little relevance to her ability to function in a work environment. It clearly does not reflect substantial evidence sufficient to overcome the extensive record of Plaintiff's emotional disabilities, and Dr. Mejia's assessment of Plaintiff's inability to work. Indeed, even SSA regulations recognize a distinction between caring for oneself and functioning independently outside of the home. See 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.06.

## II.  Remand

The fourth sentence of 42 U.S.C. § 405(g) provides: "The court shall have the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the case for a rehearing." 42 U.S.C § 405(g). Remand to the Commissioner pursuant to sentence four is authorized when there are gaps in the administrative record and further development of the evidence is required. See Rosa, 168 F.3d at 82-83; Pratts v. Chater, 94 F.3d 34, 39 (2d Cir. 1996); Almonte v. Apfel, No. 96 Civ. 1119 (JGK), 1998 WL 150996, at *9 (S.D.N.Y. Mar. 31, 1998) (citing cases).

On the other hand, the court may itself find a claimant disabled and remand solely for a calculation of benefits if the

record reveals that "application of the correct legal standard could lead to only one conclusion." <u>Schaal</u>, 134 F.3d at 504; <u>see also</u> <u>Rosa</u>, 168 F.3d at 83 ("[W]here this Court has had no apparent basis to conclude that a more complete record might support the Commissioner's decision, we have opted simply to remand for a calculation of benefits."); <u>Balsamo v. Chater</u>, 142 F.3d 75, 82 (2d Cir. 1998) (remanding for benefits where evidence of disability was such that "no purpose would be served by . . . remanding the case for hearing") (citation and internal quotation marks omitted); <u>Doyle v. Apfel</u>, 105 F. Supp. 2d 115, 120 (E.D.N.Y. 2000) (same, but noting that remand for hearing would be "appropriate if the record contained conflicting evidence").

The court's choice between these two alternatives "hinges on whether 'a more complete record might support the Commissioner's decision.'" <u>Luna de Medina v. Apfel</u>, No. 99 Civ. 4149 (SHS), 2000 WL 964937, at *3 (S.D.N.Y. July 12, 2002) (quoting <u>Rosa</u>, 186 F.3d at 82-83); <u>see also</u> <u>Ruiz v. Barnhart</u>, No. 01 Civ. 1120(DC), 2002 WL 826812, at *5 (S.D.N.Y. May 1, 2002); <u>Molina v. Barnhart</u>, No. 00 Civ. 9522 (DC), 2002 WL 377529, at *6 (S.D.N.Y Mar. 11, 2002); <u>Medina v. Apfel</u>, No. 00 Civ. 3940 (JGK), 2001 WL 1488284, at *4 (S.D.N.Y. Nov. 21, 2001); <u>Doyle</u>, 105 F. Supp. 2d at 119-20.

In the instant case, the Court concludes that a proper evaluation of Plaintiff's claim would lead inexorably to a finding of disability for the period of April 2002 to March 2003. However, the record requires clarification for the period of April through

December 2003, and a more complete record for that period could support either the Commissioner or Plaintiff. Without clarification about Plaintiff's condition during that period from Drs. Graham, Mejia, and Moscou, it is uncertain whether 1) Plaintiff would qualify as disabled under the listing in Appendix 1, or 2) whether she had the residual functional capacity to maintain employment in the national economy. Thus, this Court finds remand appropriate for calculation of benefits from April 2002 through March 2003, and for further development of the record for the period of April through December 2003.

### CONCLUSION

For the reasons stated above, the Court respectfully recommends that Plaintiff's motion be granted, that Defendant's motion be denied, and that the action be remanded for calculation of benefits and further development of the record.

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72 of the Federal Rules of Civil Procedure, the parties shall have ten days from service of this Report to file written objections. See also Fed. R. Civ. P. 6(a) and (e). Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable Laura Taylor Swain, U.S.D.J., and to the chambers of the undersigned, Room 1660. Any requests for an extension of time for filing objections must be directed to Judge Swain. Failure to file objections will result in a waiver of those objections for purposes of appeal. See Thomas v. Arn, 474 U.S. 140, 149-52, 106 S.

Ct. 466, 472-74 (1985); <u>Mario v. P & C Food Mkts., Inc.</u>, 313 F.3d

758, 766 (2d Cir. 2002); <u>Spence v. Superintendent</u>, 219 F.3d 162,

174 (2d Cir. 2000); <u>Small v. Sec'y of Health and Human Servs.</u>, 892

F.2d 15, 16 (2d Cir. 1989) (per curiam).

Respectfully submitted,

THEODORE H. KATZ
UNITED STATES MAGISTRATE JUDGE

Dated: August 11, 2006
     New York, New York

Copies mailed to:

Steven Godeski, Esq.
Legal Aid Society
Bronx Neighborhood Office
953 Southern Boulevard
Bronx, New York 10459

Susan D. Baird, Esq.
U.S. Attorney's Office
One St. Andrew's Plaza
New York, New York 10007